IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

MARLIN WILLIAMSON,         )
                           )
       Plaintiff,          )
                           )   No. 1:14-cv-00101
v.                         )   Senior Judge Haynes
                           )
ROBERT COBLE, et al.,      )
                           )
       Defendants.         )

# MEMORANDUM

Plaintiff, Marlin Williamson, an inmate at Whiteville Correctional Facility in Whiteville, Tennessee, filed this pro se action under 42 U.S.C. § 1983 against the Defendants: Robert Coble, Christian Berry, Karen Orton and Teresa Petty in their individual and official capacities.[1] Plaintiff asserts that Defendants provided him inadequate medical care and were deliberately indifferent to his diabetic medical condition when he was incarcerated at South Central Correctional Facility ("SCCF") in Clifton, Tennessee.

The Court previously dismissed Plaintiff's claim on initial review. (Docket Entry Nos. 3 and 4). Plaintiff appealed, and the Sixth Circuit reversed, concluding that Plaintiff sufficiently alleged an Eighth Amendment inadequate-medical-care claim and that his claim should not have been dismissed at that stage of the proceedings. (Docket Entry No. 27). The parties proceeded to discovery that was to be completed by December 30, 2015. (Docket Entry No. 53).

Before the Court is Defendants' motion for summary judgment (Docket Entry No. 95), contending that Plaintiff's claims against Defendants Orton and Petty should be dismissed because

---

[1] Plaintiff's claims against Defendants John Baxter and Wendy Ashe were dismissed. (Docket Entry Nos. 71 and 90).

Plaintiff failed to exhaust his administrative remedies against them; that Defendants' conduct did not amount to deliberate indifference as Defendants examined and treated Plaintiff on every occasion Plaintiff sought treatment; and that the undisputed facts show that Defendants Coble and Orton did not allow Plaintiff's medication to expire.

In response (Docket Entry No. 107), Plaintiff asserts that "[d]iscovery process is still ongoing and there may be additional documents supporting Plaintiff's claims to submit to the Court;" that Plaintiff "just recently obtained a copy of his institutional medical records and is still in the process of reviewing the information contained in the numerous documents in order to serve his First Set of Interrogatories and Request for Admissions on defendants;" that Plaintiff has provided sufficient evidence to support his claim; and that the Sixth Circuit "has already determined the plaintiff has stated a colorable claim." Id. at 1-3.

For the reasons set forth below, the Court concludes that based upon the undisputed facts Plaintiff failed to exhaust his claim for deliberate indifference to serious medical needs against Defendants Orton and Petty and Plaintiff failed to show that Defendants Coble and Berry acted with deliberate indifference to Plaintiff's serious medical needs and therefore Defendants' motion for summary judgment should be granted.

### A. Findings of Fact[2]

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Defendants filed contemporaneously with their motion for summary judgment a statement of undisputed facts (Docket Entry No. 97), in accordance with Local Rule 56.01(b). Plaintiff has not filed a response to Defendants' statement of undisputed facts. Accordingly, Defendants' proffered statements of fact

In February 2014, medical providers at Bledsoe County Correctional Complex ("BCCX"), in Bledsoe County, Tennessee, diagnosed Plaintiff with diabetes. (Docket Entry No. 97, Defendants' Statement of Undisputed Facts at ¶¶ 3-4). BCCX medical providers prescribed Plaintiff Metformin, an oral antidiabetic drug, to be taken once every day. Id. at ¶ 5. Plaintiff's prescription for Metformin was 500 mg/day, which is generally considered to be a low dosage. Id. Individuals who only take Metformin for diabetes usually have a mild case of diabetes and do not have to check their blood sugar prior to taking their medication, nor do they have to have insulin shots. Id. at ¶ 6. Normally, taking the daily Metformin pill should appropriately control that individual's blood sugar levels. Id. Plaintiff was instructed to take one 500 mg/day of Metformin to control his diabetes. Id. at ¶ 7. Plaintiff was not prescribed insulin shots and was not required to check his blood sugar before taking his daily medication. Id. BCCX medical providers also prescribed Plaintiff Paxil, Albuterol, and Niacin, among other medications, to treat various medical conditions. Id. at ¶ 8.

On or about March 24, 2014, Plaintiff was transferred to South Central Correctional Facility ("SCCF"), operated by Corrections Corporation of America ("CCA"), in Clifton, Tennessee. Id. at ¶¶ 1, 9. Pursuant to prison policy, Plaintiff underwent a full medical intake screening when he arrived at SCCF. Id. at ¶ 10. The intake nurse noted that Plaintiff suffered from diabetes, high blood pressure, high cholesterol, mental health issues and asthma. Id. at ¶ 11. The nurse noted that Plaintiff presented to SCCF with several "Keep on Person" ("KOP") medications, including 31 Metformin pills and 41 Niacin pills. Id. Pursuant to prison policy, Plaintiff was allowed to keep his KOP pills with him so that he could continue to self-administer his prescribed medication. Id. As part of this initial medical intake screening, Defendant Dr. Robert Coble, SCCF's physician,

---

are undisputed for purposes of summary judgment. Local Rule 56.01(g).

3

prescribed Plaintiff Metformin, Paxil, Niacin, and Albuterol for fourteen days for the same dosage as the medical providers at BCCX prescribed Plaintiff. Id. at ¶¶ 3, 12. This practice is normally done in order to allow inmates 14 days to see the nurse or physician, be re-evaluated and possibly receive new orders. Id.

On March 27, 2014, Plaintiff received new orders and his prescription for Metformin was extended to 180 days. Id. at ¶ 13. Plaintiff's Metformin prescription continued to be designated "KOP," meaning that Plaintiff kept the medicine in his own possession and was responsible for taking the medicine on his own. Id. According to SCCF policy, standard prescription protocols, safety concerns and other penological interests, inmates are not allowed to pick up a new KOP prescription unless and until they only have five or fewer doses of that same medication in their possession. Id. at ¶ 14. Because Plaintiff transferred from BCCX to SCCF on March 24, 2014 already having 31 Metformin pills in his possession, he would not have been allowed to pick up his new prescription until at least April 18, 2014, that would have been the earliest that he should have had five or fewer Metformin pills left in his possession if he were taking his prescriptions pursuant to his physician's instructions. Id. at ¶ 15.

Prescriptions at SCCF do not expire until the prescribed length of time for the prescription runs. Id. at ¶ 16. Therefore, Plaintiff's prescription for Metformin would not have expired until 180 days after Plaintiff was prescribed Metformin. Id. Inmates at SCCF are provided an inmate handbook that explains that to obtain prescribed medication, inmates must present to the "medication window" in the medical clinic and request their prescribed medicine. Id. at ¶ 17. Plaintiff could have presented to the pill window to pick up his prescribed Metformin at any time. Id. at ¶ 44.

Plaintiff, however, never presented to the "medication window" to request his prescription, nor did he ever submit a sick call request seeking his prescription. Id. at ¶ 18.

On May 22, 2014, Plaintiff presented to the SCCF medical clinic, seeking medical attention and complaining of chest pain and constipation. Id. at ¶ 19. Plaintiff stated that he had not had a bowel movement in over four days and that he had been vomiting. Id. Nurse Bobbie Box examined Plaintiff, noting that his abdomen was slightly tender to touch but not distended, and took his vital signs that were normal and unremarkable. Id. Nurse Box consulted with Defendant Coble, who ordered Plaintiff to immediately be given a "GI Cocktail" to treat indigestion and two Dulcolax to treat his constipation. Id. at ¶ 20. Defendant Coble also prescribed Colace for five days to treat his constipation and ordered Plaintiff to remain on a clear liquid diet for 24 hours. Id. Nurse Box administered Plaintiff the medicine that Defendant Coble prescribed and instructed Plaintiff to return to medical if his symptoms did not improve or if his chest pain returned. Id. at ¶ 21. Prior to Plaintiff presenting to medical on May 22, 2014, Plaintiff had not made any attempt to seek medical attention. Id. at ¶ 44.

On May 23, 2014, Plaintiff returned to medical at around 8:00 a.m., complaining of stomach pain and that he felt tired. Id. at ¶ 22. Plaintiff stated that his stomach pain was "right in middle and comes after I eat." Id. at ¶ 23. Plaintiff also stated that the seasoning in certain foods made his pain worse and that he had a "massive bowel movement" after taking the prescribed laxatives, that indicated the prescribed treatment was working to alleviate his complaints of constipation. Id. at ¶ 24. Nurse Box examined Plaintiff, noting that his vital signs were normal and unremarkable and that Plaintiff's abdomen was still slightly tender, but not distended. Nurse Box also noted that Plaintiff had active bowel sounds in all four quadrants of his abdomen. Id. Nurse Box then discussed with

Defendant Nurse Practitioner Christian Berry Plaintiff's condition, and based upon his symptoms at the time, Nurse Box and Defendant Berry believed that Plaintiff's symptoms were continuing to be caused by gastrointestinal issues. Id. at ¶¶ 3, 25. Defendant Berry prescribed Plaintiff Zantac for 14 days to treat his acid reflux symptoms and instructed Plaintiff to return to medical if he had any further problems. Id.

On May 23, 2014, at 3:00 p.m., Defendant Teresa Petty was the charge nurse on duty when Plaintiff returned to medical on a stretcher carried by other inmates because he was "sick." Id. at ¶ 26. Defendant Petty reviewed Plaintiff's chart to learn of Plaintiff's prior medical issues and determined that Plaintiff's symptoms and complaints had not changed except that he stated to her that he had thrown up blood on at least one occasion. Id. at ¶ 27. Defendant Petty's examination of Plaintiff revealed that Plaintiff's heart rate was slightly elevated but his vital signs were otherwise unremarkable and that he had active bowel sounds in all four quadrants of his abdomen. Id. at ¶ 28. Based upon Plaintiff's medical condition at the time, Defendant Petty agreed with the previous diagnosis that his symptoms were being caused by gastrointestinal issues. Id. at ¶ 29. Defendant Petty continued the current course of treatment and kept Plaintiff in SCCF medical for close observation because his symptoms had not abated. Id.

At 4:45 p.m. on May 23, 2014, Plaintiff continued to complain of stomach pain. Id. at ¶ 30. Defendant Petty then observed Plaintiff drinking milk that was not allowed under his prescribed clear liquid diet. Id. Believing the milk could be exacerbating his stomach pain, Defendant Petty instructed Plaintiff not to drink milk and took the milk away from him. Id. Defendant Petty contacted Defendant Berry to order another 24 hour liquid diet for Plaintiff that Defendant Berry immediately ordered. Id. at ¶ 31. Because Plaintiff continued to experience stomach pain,

Defendant Berry also ordered Plaintiff to be admitted to the medical infirmary to keep Plaintiff under close medical observation. Id. At no time did Defendants Orton or Pettty laugh at Plaintiff or at his condition. Id. at ¶ 45.

That night, at 7:15 p.m., Nurse Kathy Curry checked Plaintiff's condition and observed that Plaintiff's condition had worsened and his symptoms had changed. Id. at ¶ 32. Nurse Curry noted that Plaintiff's eyes were bulging and his breath had an unusual smell. Id. Plaintiff informed Nurse Curry that he "used to be diabetic" and that he had not taken his diabetes medication as prescribed while at SCCF. Id. at ¶ 33. Plaintiff complained of dizziness, excessive urination and dry mouth, that are possible symptoms of diabetes. Id. at ¶ 34. Nurse Curry took a blood sample from Plaintiff and discovered that Plaintiff's blood sugar was abnormally high. Id. Nurse Curry informed Defendant Berry of Plaintiff's condition, and Defendant Berry immediately ordered Plaintiff be transferred to the Wayne County Medical Center emergency room. Id. at ¶ 35. Nurse Curry noted that Plaintiff had not picked up his prescribed KOP medications, as previously instructed two months earlier. Id. at ¶ 36. These KOP medications not only included Metformin, but also his prescribed blood pressure medicine. Id.

At the Wayne County Emergency Room, Plaintiff's blood work showed that his glucose was over 900, which is high. Id. at ¶ 37. Plaintiff was given normal saline and an insulin drip and was then transferred to Maury Regional Hospital for additional care. Id.

On May 25, 2014, after he was stabilized, Plaintiff was sent to DeBerry Special Needs Facility ("DeBerry") in Nashville, Tennessee, which is a Tennessee Department of Correction ("TDOC") prison that houses inmates with certain medical conditions. Id. at ¶ 38. While at DeBerry, Plaintiff's medical records reflect that medical personnel spoke to Plaintiff about the need

to take his prescribed medication and to remain medically compliant. Id. at ¶ 39. Though he was not fully cooperative at first, Plaintiff agreed that he would watch his diet and take his prescribed medicine, now that he was "aware of his illness." Id. Plaintiff remained at DeBerry until June 12, 2014, when he was transferred back to SCCF. Id. at ¶ 38.

SCCF follows TDOC's grievance policy that allows inmates to submit a written complaint concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within SCCF that personally affects the inmate. Id. at ¶ 40. Upon arrival at SCCF, each inmate is given an inmate handbook that contains the grievance procedure. Id. The policy requires inmates to submit a grievance within "seven calendar days of the occurrence giving rise to the grievance" and that inmates "shall describe the problem in detail, including times, dates, names, etc., when appropriate." Id. The grievance process provides three (3) levels of review. Id. at ¶ 41. Grievances are first reviewed by a grievance chairperson, who issues a response. Id. Within five days of being notified of the response, the inmate may appeal to the grievance committee and warden. Id. If an inmate appeals, the grievance committee conducts a hearing on the inmate's grievance and issues a recommendation to the warden. Id. After the warden makes a decision, the inmate may then appeal the warden's decision within five days to the TDOC deputy commissioner. Id. The deputy commissioner's decision is final and not appealable. Id.

On August 7, 2014, Plaintiff filed a grievance for inadequate medical care against Defendant Coble and Defendant Berry. (Docket Entry No. 101, at 7-8). Plaintiff alleged that on April 15, 2014 Defendants Coble and Berry allowed his medication to expire, causing Plaintiff "to be in a diabetic coma." Id. at 8; Docket Entry No. 97 at ¶ 42. Plaintiff alleged that he previously "wrote [a

grievance] back in June when [he] first came back from Special Needs," but that it "was ignored." Id. at 8. Plaintiff did not make any complaints about Defendants Orton or Petty in this grievance. Id.; Docket Entry No. 97 at ¶ 42. Plaintiff's grievance was denied, and Plaintiff proceeded through the appeal process. Id. at 5-12. On September 17, 2014, the TDOC deputy commissioner concurred with the supervisor's response. Id. at 5.

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its

10

initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]... must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply</u>

11

<u>at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

> It is likewise true that:
> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." <u>Webster's Third New InterNational Dictionary</u> (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an

element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Thus, under the PLRA a prisoner must exhaust all available remedies before filing an action in court. Porter v. Nussle, 534 U.S. 516, 524 (2002). These

"remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" Id. (citation omitted). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,'-rules that are defined not by the PLRA, but by the prison grievance process itself. . . . The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007) (citations omitted). "[E]xhaustion is required even if the prisoner subjectively believes the remedy is not available; even when the state cannot grant the particular relief requested; and 'even where [the prisoners] believe the procedure to be ineffectual or futile....'" Napier v. Laurel Cty., Ky., 636 F.3d 218, 222 (6th Cir. 2011) (citations omitted). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life." Porter, 534 U.S. at 532.

In Woodford v. Ngo, 548 U.S. 81 (2006), the United States Supreme Court was presented with the question of whether a prisoner can satisfy the PLRA's exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal and held that "proper exhaustion of administrative remedies is necessary." Id. at 83-84. The Supreme Court explained:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]

Id. at 95.

15

In Cook v. Caruso, 531 F. App'x 554 (6th Cir. 2013), the Sixth Circuit affirmed the district court's dismissal of the plaintiff's complaint for failure to exhaust his administrative remedies because the plaintiff's first grievance failed to give notice to prison officials of the problem that formed the basis of his complaint, i.e., his placement on the top bunk, and his second grievance was time-barred. Id. at 555-56. Quoting Woodford, the Sixth Circuit stated, "Proper exhaustion of administrative remedies requires 'compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.'" Id. at 562 (quoting Woodford, 548 U.S. at 90–91) (footnote omitted); see Scott v. Ambani, 577 F.3d 642, 647 (6th Cir. 2009) ("Woodford makes clear that a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance.").

Here, based upon the undisputed facts, Plaintiff did not file a grievance as to his claim for denial of medical care against Defendants Orton and Petty, and therefore Plaintiff's claim against these Defendants should be dismissed for failure to exhaust administrative remedies.

The Eighth Amendment guarantees a prisoner the right to medical care. This right has been violated when jailers are deliberately indifferent to a prisoner's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). The Supreme Court has stated:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

> This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. . . .
>
> . . . .
>
> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Id. at 104-06 (citations and footnotes omitted). A prisoner's difference of opinion regarding diagnosis or treatment also does not rise to the level of an Eighth Amendment violation. Id. at 107.

An Eighth Amendment claim of denial of medical care has both an objective and a subjective component. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). The objective component requires that the plaintiff's medical needs were sufficiently serious. Id. "A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment." Burgess v. Fischer, 735 F.3d 462, 476 (6th Cir. 2013) (citing Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 897 (6th Cir. 2004)). Yet, actual physical injury due to indifference is not required. Unnecessary suffering is sufficient for Eighth Amendment purposes. Boretti v. Wiscomb, 930 F.2d 1150, 1154-55 (6th Cir. 1991).

As to the subjective component, deliberate indifference "should be determined in light of the prison authorities' current attitudes and conduct." Helling v. McKinney, 509 U.S. 25, 36 (1993). "[T]he plaintiff must allege facts which, if true, would show that the official being sued subjectively

perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Officials may be shown to be deliberately indifferent to serious needs without evidence of conscious intent to inflict pain. Molton v. City of Cleveland, 839 F.2d 240, 243 (6th Cir.1988). "However, the conduct for which liability attaches must be more culpable than mere negligence; it must demonstrate deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). Further, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.'" Graham ex rel. Estate of Graham v. Cty. of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Yet, "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." Westlake, 537 F.2d at 860 n.5.

Here, the undisputed facts do not reflect any inference of deliberate indifference by Defendants Coble and Berry. The undisputed facts show that Plaintiff arrived at SCCF with 31 Metformin pills, that he was allowed to pick up his medication at any time after he took all but 5 of his pills, and that Plaintiff did not present to the pill window at any time before April 18, 2014 or thereafter to request his prescription, nor did he ever submit a sick call request seeking his prescription. The undisputed facts also show that in March 2014 Plaintiff his prescription for Metformin was extended to 180 days, meaning that his prescription would not expire until sometime

in September 2014. The undisputed facts further show that every time Plaintiff requested medical treatment, SCCF medical staff examined and treated him.

Accordingly, for these reasons, the Court concludes that Defendants' motion for summary judgment (Docket Entry No. 95) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the __12th__ day of September, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge